T.C. Memo. 1998-440


UNITED STATES TAX COURT


FRANK GANT AND ROBERTA GANT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17090-95.            Filed December 15, 1998.


     G was the president, the sole shareholder, and a highly
compensated employee of O.  O sponsored a defined benefit
plan and defined contribution plan for its employees which
were both qualified within the meaning of sec. 401(a),
I.R.C.  Ps alleged that O terminated both plans in the June
30, 1988, plan year when it adopted a resolution to
terminate the plans immediately and distributed individual
annuity contracts to plan participants.  Subsequently, R
disqualified both plans for the plan year ended June 30,
1991, for, among other reasons, their failure to meet the
participation requirements of sec. 401(a)(26), I.R.C.  R
determined deficiencies in Ps' Federal income taxes for
their 1991, 1992, and 1993 taxable years due to their
failure to include in gross income G's vested accrued
benefit in the Pension Plan in 1991, G's account balance in
the Profit Plan in 1991, and accrued benefits under both
Plans in 1992 and 1993.

     1. <u>Held</u>, for purposes of the Internal Revenue Code,
strict adherence to the requirements of ERISA sec. 4041 are

the exclusive means of terminating a single-employer defined benefit plan.  Held, further, whether a defined contribution plan is terminated is generally a question to be determined with regard to all the facts and circumstances in a given case.  Secs. 1.411(d)-2(c)(3), 1.401-6(b)(1), Income Tax Regs.  Held, further, P must include the value of his vested accrued benefits in gross income for 1991-93 taxable years.


Frank Gant and Roberta Gant, pro se.

Roger P. Law, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge:  Respondent determined the following deficiencies and penalties with respect to the Federal income taxes of petitioners Frank Gant (Gant) and Roberta Gant:

| Year | Deficiency | Sec. 6663(a) |
| --- | --- | --- |
| 1991 | $230,397 | $172,798 |
| 1992 | 18,012 | 13,509 |
| 1993 | 21,978 | 16,484 |

Respondent filed an Amended Answer which asserted additions to tax under section 6662(a) for the taxable years 1991, 1992, and 1993 in the amounts of $46,079, $3,602, and $4,395, respectively.  In the Amended Answer respondent conceded the section 6663(a) penalty for all years.  At trial, respondent conceded the section 6662(a) penalty for all years.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years in

issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts are rounded to the nearest dollar.

After concessions by respondent, the sole issue remaining for decision is whether, under section 402(b), petitioners must include the aggregate vested accrued benefit of Gant's participation in the Pension Plan and Profit Sharing Plan in gross income for the 1991, 1992, and 1993 taxable years.

This dispute stems from Gant's participation in two initially qualified, but subsequently disqualified, retirement plans administered by his employer O.W.G. Products, Inc. (Products).  Respondent argues that petitioners must include the aggregate vested accrued benefits of Gant's participation in gross income for 1991, 1992, and 1993, because the retirement plans were disqualified under section 401(a)(26), relating to "additional participation requirements", on June 30, 1991, and Gant was a highly compensated employee (within the meaning of section 414(q)) during the 1991, 1992, and 1993, plan years. Petitioners counter that said plans were terminated in the June 30, 1988 plan year, and, thus, the plans were not subsequently required to meet the requirements of section 401(a)(26).

## FINDINGS OF FACT

Petitioners are married and resided in California at the time they filed their petition.

Gant was the president and 100 percent shareholder of Products from 1981 through 1994.  Products adopted the O.W.G. Products, Inc. Employees' Defined Benefit Plan and Trust (Pension Plan) and the O.W.G. Products, Inc. Employees' Money Purchase Plan and Trust (Money Purchase Plan), both effective July 1, 1980.  Initially, both the Pension Plan and Money Purchase Plan were qualified plans within the meaning of section 401(a).  The Money Purchase Plan was converted into the O.W.G. Products, Inc. Employees' Profit Sharing Plan and Trust (Profit Sharing Plan) effective July 1, 1988.  Each plan had a plan year ending June 30.

Gant was the trustee of the Pension Plan, Money Purchase Plan, and Profit Sharing Plan and also the Plan Fiduciary under the Money Purchase Plan and Profit Sharing Plan.

The Pension Plan's normal retirement benefit was 100 percent of a participant's highest average monthly compensation.  The Money Purchase Plan maintained individual accounts for each participant, contained a mandatory contribution formula, and provided a retirement benefit equal to the participant's accumulated account balance.  The Profit Sharing Plan contained a discretionary contribution formula and provided for a retirement benefit equal to a participant's accumulated account balance.

On October 13, 1987, Products' board of directors passed a resolution to terminate the Pension Plan and Money Purchase Plan. The resolution read as follows:

> Immediately terminate the company pension plans noted as the O.W.G. Products, Inc., Employees Defined Benefit Pension Plan and the O.W.G. Products, Inc., Money Purchase Plan and to notify the pension administrator, Pension Services Corporation of this meeting and instruct that these plans be terminated immediately in the current plan year and in accordance with appropriate tax guidelines, as outlined under the Internal Revenue Code and in accordance with the provisions of the Pension Benefit Guaranty Corporation for terminating plans and other laws regarding pension benefit plans as required.

Gant wrote a letter dated October 15, 1987, to Pension Services Corporation (Pension Services), the plans' third-party administrator, requesting that the Pension Plan be discontinued.

Neither Products nor Gant gave written notice to plan participants of the intent to terminate the Pension Plan and the Money Purchase Plan during the Pension Plan and the Money Purchase Plan years ended June 30, 1988. Furthermore, Products did not give written notice to the Pension Benefit Guaranty Corporation (PBGC) of its intent to terminate the Pension Plan.

On June 22, 1988, Gant, acting as trustee for both the Pension Plan and Profit Sharing Plan (formerly the Money Purchase Plan) purchased group annuity contracts for the participants in these plans. On December 6, 1988, Gant distributed individual annuity contracts to the plan participants. The present value of vested accrued benefits for the Pension Plan's participants was

$640,383 as of June 30, 1987. The cost and present value (as of the time of purchase) of the group annuity contract was $382,467. The aggregate value of the Profit Sharing Plan's accumulated vested account balances was $413,746, as of June 30, 1988. The cost and present value (as of the time of purchase) of the group annuity contract was $56,031.

Products distributed annual benefits statements to Pension Plan participants through the plan year ending June 30, 1991. Annual benefits statements were not distributed thereafter. Products filed Form 5500 for all plan years until the plan year ending June 30, 1991. For the plan years ended June 30, 1988, June 30, 1989, and June 30, 1990, Products stated on Form 5500 that the Pension Plan had not been terminated. On Form 5500 for the plan year ended June 30, 1991, Products disclosed that the Pension Plan had been terminated.

For the plan year ended June 30, 1988, Products stated on Form 5500 that the Money Purchase Plan had not been terminated. For the plan years ending on June 30, 1989 and June 30, 1990, Products stated that the Profit Sharing Plan had not been terminated. Products did not file Form 5500 for the Profit Sharing Plan thereafter.

During the plan years ended June 30, 1991, only 15 of 66 eligible employees were benefiting under both the Pension Plan and Profit Sharing Plan. Fifty-one eligible employees were

excluded despite meeting both plans' age and service requirements.

On January 27, 1992, Gant signed Form 500, Standard Termination Notice, Single-Employer Plan Termination, for the Pension Plan and sent it to the PBGC. This Form 500 disclosed that the proposed Pension Plan termination date was June 30, 1992. The PBGC responded with a Notice of Non-compliance dated March 5, 1992.

On February 10, 1992, Gant issued a letter to the Pension Plan participants stating: "We are in the process of filing the necessary documents to terminate the O.W.G. PRODUCTS, INC. EMPLOYEES DEFINED BENEFIT PLAN."

On February 12, 1992, Products filed a Form 5310, Application for Determination Upon Termination, for the Pension Plan. The proposed date of the Pension Plan's termination was June 30, 1991. On August 19, 1992, respondent issued a favorable determination letter for the proposed termination. Products did not file a Form 5310 for the Profit Sharing Plan. Respondent disqualified both plans on February 7, 1997, effective for the plan year ending June 30, 1991.

On May 29, 1992, Gant, as trustee for both the Pension Plan and Profit Sharing Plan, collected all the individual annuity certificates previously distributed to plan participants and redeemed them for cash. Upon redemption, the cash value of the

Pension Plan annuity contracts was $491,904.  The Profit Sharing Plan annuity contracts were redeemed for $69,231.  Gant deposited the redemption proceeds into each plan's respective trust.

After June 30, 1991, Gant's benefits increased.  His accrued benefits in the Pension Plan increased due to his additional service with Products and his Profit Sharing Plan vested account balance increased due to his pro rata share of income from the Profit Sharing Plan.

### OPINION

The central issue for decision is whether petitioners must include Gant's vested accrued benefits in Products' Pension Plan and Profit Sharing Plan in gross income for petitioners' 1991, 1992, and 1993 taxable years.

Section 402(b) provides for a variety of consequences to the participants in a plan under section 401(a) when the trust associated with the plan is not exempt under section 501(a). Section 402(b)(2) and (4), as in effect for the years in issue, contain a special rule when the trust tax exemption is lost due to coverage violations in the plan.

Section 402(b)(2)(A) provides that if one of the reasons a trust is not exempt from tax under section 501(a) is the failure of the plan of which it is a part to meet the employee participation or minimum coverage requirements of section 401(a)(26) or 410(b), respectively, then a highly compensated

employee (as defined in section 414(q)) shall, in lieu of the amount determined under paragraph (1) of section 402(b), include in gross income for the taxable year with or within which the taxable year of the trust ends an amount equal to the vested accrued benefit of such employee (other than the employee's investment in the contract) as of the close of such taxable year of the trust.[1]

Gant was a participant in both plans from their inception in 1980. In a "Schedule of Benefits" for the Pension Plan for the plan year ending June 30, 1987, Gant is listed as 100 percent vested. Gant was also 100 percent vested in his account balance in the Profit Sharing Plan since that Plan (into which the Money Purchase Plan was converted) recognized all service with the employer and utilized a 7-year vesting schedule.

Thus, determination of the central issue to be decided hinges upon our analysis of three subissues: (1) Whether both the Pension Plan and Profit Sharing Plan were ongoing plans as of the

---

[1]Sec. 402(b)(2) was added by the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 1112(c)(2), 100 Stat. 2445, effective for plan years beginning after Dec. 31, 1988. Sec. 402(b)(2)(A) was amended by the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. 100-647, sec. 1011(h)(4), 102 Stat. 3342, 3464, effective as if included in the TRA. Sec. 402(b)(2) was amended again by the Unemployment Compensation Amendments of 1992, 106 Stat. 299. No substantive change was made to former sec. 402(b)(2). It was merely renumbered as sec. 402(b)(4), effective for distributions occurring after Dec. 31, 1992. Secs. 401(a)(26)(A), 402(b)(2) (1988 amendment), 410(b)(1), and 414(q)(1), are reproduced in the appendix.

- 10 -

plan year ended June 30, 1991; (2) if so, whether one of the reasons both plans were not exempt from tax was the failure of the plans to meet the requirements of either section 401(a)(26) or section 410(b); and (3) whether Gant was a highly compensated employee under section 414(q) during the taxable years at issue.

For the reasons stated below, we agree with respondent.

I.    Plan Disqualification in Plan Year Ending June 30, 1991

As stated, the first subissue is whether the Pension Plan and Profit Sharing Plan were ongoing plans as of June 30, 1991. Petitioners assert that Products terminated both the Pension Plan and Money Purchase Plan (predecessor of the Profit Sharing Plan) during their respective Plan years ended June 30, 1988. Petitioners point to the fact that the Products board of directors adopted a resolution on October 13, 1987, to immediately terminate both the Pension Plan and Money Purchase Plan.  Furthermore, they argue, Gant wrote a letter on October 15, 1987, to Pension Services requesting that the Pension Plan be discontinued as of November 1, 1987.  It follows from petitioners' assertions that under their theory the plans were not required to cover employees employed by Products after the plan year ending June 30, 1988.  Thus, petitioners appear ultimately to argue that the plans could not have violated the participation requirements of section 401(a)(26) or coverage

requirements of section 410(b) in the plan year ended June 30, 1991, since they were no longer in existence.

Respondent argues that the Pension Plan was not terminated as of June 30, 1988, because statutory requirements were not followed, and the Money Purchase Plan was not terminated as of the end of the same year because Products did not intend to terminate it then. Thus, according to respondent, it follows that both the Pension Plan and the Money Purchase Plan (predecessor of the Profit Sharing Plan) were ongoing plans through the plan year ending June 30, 1991, and were required to meet the requirements of sections 401(a)(26) and 410(b).

A.   Pension Plan Termination

For purposes of the Internal Revenue Code, if a plan is covered by title IV of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829, such plan is "considered terminated on a particular date if, as of that date-- (i) The plan is voluntarily terminated by the plan administrator under section 4041 of the Employee Retirement Income Security Act of 1974". Sec. 1.411(d)-2(c)(2), Income Tax Regs. (Emphasis added.) ERISA governs pension plan terminations. ERISA sec. 4021, 29 U.S.C. sec. 1321(a), provides that title IV covers a plan which "is an employee benefit pension plan * * * [or] is, or has been determined by the Secretary of the Treasury to be, a plan described in section 401(a) of title 26". In this case, the

Pension Plan received determination letters from the Internal Revenue Service finding that the plan qualified under section 401(a).

The term "employee pension benefit plan" or "pension plan" means:

> any plan, fund, or program which * * * is hereafter established or maintained by an employer * * * to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. [ERISA sec. 3(2), 29 U.S.C. sec. 1002(2)(A).]

Title IV does not cover a plan "which is an individual account plan." ERISA sec. 4041(b)(1), 29 U.S.C. sec. 1321(b)(1). An "individual account plan" or "defined contribution plan" means

> a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account. [ERISA sec. 3(34), 29 U.S.C. sec. 1002(34).]

The Pension Plan is not an individual account plan because it does not maintain individual accounts for each participant and bases a participant's retirement benefit upon 100 percent of the participant's average monthly compensation. Thus, the Pension

Plan is covered by title IV of ERISA and is subject to the termination provisions thereunder.

Strict adherence to statutory requirements is the exclusive means of single-employer plan termination. ERISA sec. 4041(a)(1), 29 U.S.C. sec. 1341(a)(1) provides that "a single-employer plan may be terminated only in a standard termination * * * or a distress termination". See also Phillips v. Bebber, 914 F.2d 31, 34 (4th Cir. 1990) ("strict compliance with * * * [29 U.S.C. sec. 1341] is the sole means by which a pension plan subject to the provisions of ERISA may be terminated."); Pension Benefit Guar. Corp. v. Mize Co., Inc., 987 F.2d 1059, 1063 (4th Cir. 1993) ("The statutory provisions governing terminations of single-employer plans are exclusive."). A "single-employer plan" is a plan "which is not a multiemployer plan." ERISA sec. 3(41), 29 U.S.C. sec. 1002(41). A "multi-employer plan" means a plan:

> (i) to which more than one employer is required to contribute,
>
> (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and
>
> (iii) which satisfies such other requirements as the Secretary may prescribe by regulation. [ERISA sec. 3(37), 29 U.S.C. sec. 1002(37).]

Because Products was the only employer contributing to the plan, the Pension Plan was not a multiemployer plan, and by definition was a single-employer plan.

Since the Pension Plan was a single-employer plan, the question then becomes whether it was terminated in accordance with ERISA sec. 4041(a)(1), 29 U.S.C. sec. 1341(a)(1). As stated, a single-employer plan may be terminated only in a standard or distress termination. ERISA sec. 4041(a)(1), 29 U.S.C. sec. 1341(a)(1). A distress termination requires that the PBGC determine whether any of the criteria for a distress termination have been met. ERISA sec. 4041(c)(2)(B), 29 U.S.C. sec. 1341(c)(2)(B). In this case, the PBGC has made no such finding. Thus, the remaining question is whether the Pension Plan was terminated as of June 30, 1988, by a standard termination.

A standard termination requires the plan administrator to (1) provide a "60-day advance notice of intent to terminate to affected parties", (2) notify the PBGC as soon as practicable after notice of intent to terminate has been sent to affected parties, and (3) give notice, not later than the date on which notice is sent to the PBGC, to each participant or beneficiary under the plan specifying the amount of his or her benefit as of the proposed termination date and the data used to determine the benefit such as length of service, age of the participant or beneficiary, wages, assumptions, including the interest rate, and any other information required by the PBGC. ERISA sec. 4041(b)(2)(B), 29 U.S.C. sec. 1341(b)(2)(B). The plan

"administrator" is the plan sponsor if no person is designated as plan administrator in the plan instrument. ERISA sec. 3(16)(A), 29 U.S.C. sec. 1002(16)(A). The "plan sponsor" is the employer in the case of a single-employer defined benefit plan. ERISA sec. 3(16)(B), 29 U.S.C. sec. 1002(16)(B). Since Products is the employer, Products is the plan administrator.

In this case, Products did not comply with the statutory requirements cited above. It did not issue written notice to participants in fiscal year 1988, within 60 days, of the intent to terminate the Pension Plan. It did not notify the PBGC of its intent to terminate. And it did not give the required notice to each participant or beneficiary under the plan specifying the amount of his or her benefit as of the proposed termination date.

Accordingly, we hold that the Pension Plan was not terminated as of June 30, 1988. We further hold that since the Pension Plan was not terminated in accordance with ERISA sec. 4041, 29 U.S.C. sec. 1341, the Pension Plan was an ongoing plan for purposes of the Internal Revenue Code.

B. Money Purchase Plan Termination and Profit Sharing Plan Disqualification

Petitioners assert that the Money Purchase Plan was terminated as of the plan year ending June 30, 1988, because Products adopted a resolution to terminate the Money Purchase Plan in the 1988 fiscal year, and Products distributed annuities to plan participants evidencing its intent to terminate the plan.

ERISA's title IV termination provisions do not cover individual account plans. ERISA sec. 4041(b)(1), 29 U.S.C. sec. 1321(b)(1). Here, the Money Purchase Plan maintains a separate account for each participant and provides that an employee's benefit will be based on the value of his or her account. Therefore, the Money Purchase Plan is an individual account and not covered by title IV of ERISA.

For purposes of the Internal Revenue Code, a plan not subject to title IV is "terminated on a particular date if, as of that date, the plan is voluntarily terminated by the employer * * * maintaining the plan." Sec. 1.411(d)-2(c)(3), Income Tax Regs. Voluntary termination of a defined contribution plan "is generally a question to be determined with regard to all the facts and circumstances in a particular case." Sec. 1.401-6(b)(1), Income Tax Regs.

The key determining factor is whether Products intended to terminate the plan as of June 30, 1988. See J.P. Jeter Co., Inc v. Commissioner, T.C. Memo. 1993-231 (holding that a money purchase pension plan was not terminated where the facts did not indicate an intent on the part of taxpayer to terminate the plan). Disclosures on Federal tax forms, notice of termination to plan participants, and action by the plan administrator's board of directors are relevant to this determination. See id.

In J.P. Jeter Co., Inc. v. Commissioner, supra, the Commissioner determined that taxpayer was liable for excise taxes imposed by section 4971(a) and (b) due to a section 412 accumulated funding deficiency in its money purchase pension plan. Taxpayer's money purchase pension plan was effective beginning January 1, 1981. Due to taxpayer's business circumstances, taxpayer failed to make contributions to the plan after the plan year ending December 31, 1982. Taxpayer requested a funding waiver in September of 1985. The request stated that taxpayer anticipated contributions to resume in 1986 or 1987. Attached to the waiver request was a Form 5500-R for the plan year 1983 which stated that the plan was not terminated in 1983. The waiver was granted in February of 1986. Taxpayer sent a request for a determination letter on termination of the plan in March of 1987. Attached to this letter was a copy of a resolution adopted by taxpayer's board of directors on June 16, 1986 "to terminate the J.P. Jeter Company, Inc. Money Purchase Plan as of December 31, 1984." The Commissioner sent a favorable determination letter on October 21, 1987, declaring that it applied as to the proposed termination date of June 16, 1986.

Taxpayer in the above case argued that the plan was terminated in 1982 when it ceased making contributions to the plan, thereby ceasing to meet the plan's funding requirements at such time. We held that the plan was terminated "around June 16,

1986" because "The evidence presented does not show that petitioner desired or intended to terminate the plan in 1983." This holding rested primarily upon application of the following facts: (1) Form 5500-R stated that the plan was not terminated in 1983; (2) the waiver request indicated that contributions were to resume in 1986 or 1987; (3) notice of termination was not sent to any of the plan participants; and (4) the board's resolution to terminate the plan was not adopted until June 16, 1986.

In this case, Products stated on Form 5500-R for the Money Purchase Plan's June 30, 1988, plan year that the plan was not terminated. Form 5500-R filed for the Profit Sharing Plan's fiscal 1989 and 1990 plan years also stated that the plan was not terminated. There is no evidence that Products notified plan participants of its intent to terminate the Money Purchase Plan during the plan year ending on June 30, 1988.

Gant's testimony suggests that he believed participants of the Profit Sharing Plan received some notice of termination in the latter part of calendar year 1988. At trial, Gant stated on direct examination:

> The plans were stopped by the corporation and everything, and we advised the Pension Services Corporation to stop the plans at that time.

> At that time they came back, and we got bids and we bought annuities for all participants of the plan, with the * * * [exceptions] of ones that wanted to be paid off.

> We paid off the ones that wanted to be paid off, and bought annuities for everyone else, and had them sent to their homes.

However, the participants' accumulated vested account balances were valued at $413,746, while the group annuity contract purchased and distributed by Gant was valued at only $56,031. Even if the plan participants had received some notice of termination, the substantial discrepancy in value between benefits and distribution is inconsistent with a plan termination.

Finally, although Products' board of directors resolution stated an intent to terminate the Money Purchase Plan by the end of the plan year ended June 30, 1988, the subsequent conversion of the Money Purchase Plan into the Profit Sharing Plan on September 1, 1988, is inconsistent with the board's stated intent.

We hold that the Money Purchase Plan was not terminated in the plan year ended June 30, 1988, because the evidence fails to show that Products intended to or did terminate it. We further hold that the Profit Sharing Plan was not terminated and was an ongoing plan until June 30, 1991.

II.  The Plans Fail to Meet the Requirements of Sec.
401(a)(26)(A)

Since we have held that the Pension Plan and Profit Sharing Plan were both ongoing plans, the next subissue is whether the plans failed to meet the requirements imposed by either section 401(a)(26) or 410(b).

To satisfy the requirements of section 401(a)(26)(A), a plan generally must benefit the "lesser of--(i) 50 employees of the employer, or (ii) 40 percent or more of all employees of the employer."  It has been stipulated that the plans excluded from participation 51 of the 66 eligible employees for the plan year ended June 30, 1991.  It has further been stipulated that only 15 eligible employees were participating in the plans for the plan years ended June 30, 1991.  Forty percent of the 66 eligible employees is 26 employees.  Since only 15 eligible employees were participating and therefore benefiting under the plans, both plans fail to meet the participation requirements of section 401(a)(26)(A).  Since the plans fail to meet the participation requirements of section 401(a)(26), we need not consider whether the plans meet the minimum coverage requirements of section 410(b).

III.  Highly Compensated Employee

Section 402(b)(2) requires that if a plan fails to satisfy section 401(a)(26), a highly compensated employee must include in gross income his "vested accrued benefit" determined as of the

close of the taxable year of the trust which ends with or within the employee's taxable year.  The term "highly compensated employee" is defined to include "any employee who, during the year or the preceding year--(A) was at any time a 5-percent owner".  Sec. 414(q)(1)(A).  An employee is treated as a 5-percent owner if he or she was a 5-percent owner as defined in section 416(i)(1).  Under section 416(i)(1)(B), if the employer is a corporation, a 5-percent owner means "any person who owns (or is considered as owning within the meaning of section 318) more than 5 percent of the outstanding stock of the corporation".  Since Gant was the 100-percent shareholder of Products from 1981 through 1994, he was a highly compensated employee for purposes of the taxable years at issue.

The House conference report to accompany the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, as a part of which section 402(b)(2) was enacted, states that "Highly compensated employees * * * are taxable on the value of their vested accrued benefit attributable to employer contributions and income on any contributions to the extent such amounts have not previously been taxed to the employee."  H. Conf. Rept. 99-841, at II-416 to II-417 (1986), 1986-3 C.B. (Vol. 4), 416-417.  The parties stipulated that as of June 30, 1991, Gant had a benefit under the Pension Plan of "at least" $353,762, and an account balance in the Profit Sharing Plan of $353,688, for a total benefit under

both plans as of that date of at least $707,451.  On brief, respondent states that the deficiencies were determined using the $353,762 figure under the Pension Plan.  We accept $353,762 as Gant's Pension Plan vested accrued benefit as of June 30, 1991, since neither party has urged a different amount, the "at least" modifier in the stipulation notwithstanding.

There is no indication in the record, and we have no reason to believe, that Gant's vested accrued benefit under the Pension Plan as of June 30, 1991, and his account balance under the Profit Sharing Plan as of that date, have been taxed prior to petitioners' 1991 taxable year.  Petitioners do not challenge respondent's computation of the 1992 and 1993 accruals.  We accordingly hold that petitioners must include in 1991 gross income Gant's $707,451 total vested accrued benefits under the Pension Plan and Profit Sharing Plan as of June 30, 1991, and must include in gross income the additional accrued benefits under both plans in 1992 and 1993, respectively, as determined by respondent.

To reflect the foregoing,

Decision will be entered

under Rule 155.

## Appendix

Section 401(a)(26)(A)

(26)  Additional participation requirements.--

(A)  In general.--A trust shall not constitute a qualified trust under this subsection unless such trust is part of a plan which on each day of the plan year benefits the lesser of --

(i)  50 employees of the employer, or

(ii) 40 percent or more of all employees of the employer.

Section 402(b)(2)(A)

(b)  Failure to meet requirements of section 410(b).--

(A)  Highly compensated employees.--If 1 of the reasons a trust is not exempt from tax under section 501(a) is the failure of the plan of which it is a part to meet the requirements of section 401(a)(26) or 410(b), then a highly compensated employee shall, in lieu of the amount determined under paragraph (1), include in gross income for the taxable year with or within which the taxable year of the trust ends an amount equal to the vested accrued benefit of such employee (other than the employee's investment in the contract) as of the close of such taxable year of the trust.

*     *     *     *     *     *     *

(C)  Highly compensated employee.--For purposes of this paragraph, the term "highly compensated employee" has the meaning given such term by section 414(q).

Section 410(b)(1)


(b) Minimum coverage requirements.--

(1)  In general.  A trust shall not constitute a qualified trust under section 401(a) unless such trust is designated by the employer as part of a plan which meets 1 of the following requirements:

(A)  The plan benefits at least 70 percent of employees who are not highly compensated employees.

(B)  The plan benefits--

(i)  a percentage of employees who are not highly compensated employees which is at least 70 percent of

(ii)  the percentage of highly compensated employees benefiting under the plan.

(C)  The plan meets the requirements of paragraph (2).


Section 414(q)(1)


(q)  Highly compensated employee.--

(1)  In general.--The term "highly compensated employee" means any employee who, during the year or the preceding year --

(A)  was at any time a 5-percent owner,

(B)  received compensation from the employer in excess of $75,000,

(C)  received compensation from the employer in excess of $50,000 and was in the top-paid group of employees for such year, or

(D)  was at any time an officer and received compensation greater than 50 percent of the amount in effect under section 415(b)(1)(A) for such year.

The Secretary shall adjust the $75,000 and $50,000 amounts under this paragraph at the same time and in the same manner as under section 415(d).